*Harwood, for appellant.*

*Robert, for appellees.*

---

WOODSON ARNOLD ET AL. *v.* SAMUEL HANNON ET AL.

**Wills—Undue Influence.**

The evidence was held to show that a will was procured by undue influence of the testator's wife.

APPEAL FROM BOYLE CIRCUIT COURT.

November 11, 1873.

OPINION BY JUDGE PETERS:

A paper purporting to be the last will and testament of Blake Arnold, deceased, bearing date the 19th of March, 1872, was ad-

mitted to probate by the Boyle County Court at its June term, 1872; but on an appeal to the circuit court it was set aside by the verdict of a jury and the judgment of that court. And the propounders of the instrument have appealed to this court.

It is clearly established by the evidence that the instrument was executed in conformity to the forms and ceremonies required by law, so that the questions presented for consideration are whether Blake Arnold, at the time the instrument purports to have been executed, had the capacity to make a will; and whether it was executed free from the control of extraneous influences.

Decedent had been twice married. By his first wife he had one son and three daughters, and by his last wife he had five sons. He owned at the time of his death about nine hundred acres of land, and a very considerable personal estate, equal or perhaps greater in value than his land, and the whole worth from $25,000 to $30,000. To his wife he gave 140 acres of land during her life, $500 in cash, two horses, other stock, and some farming implements of inconsiderable value; to his older son he gave $1,800, from which was to be deducted $600, which he had previously loaned him; to his daughter, Mrs. Hannon, he gave $500; to Mrs. Holland he gave $1,000, less five hundred dollars, which he had loaned her husband; and to Mrs. Crane he left $1,500; and all the residue of his estate he gave to his five sons by his last marriage, including the remainder interest in the land he gave to his wife during her life. The older set of children being dissatisfied with this disposition of the father's property, contested the testamentary document on the grounds stated, and were successful in the court below.

A. G. Burton, a witness for appellants, proved he was the draftsman of the instrument; that he went with S. E. Bottom and S. P. Burton, the subscribing witnesses, to the house of Blake Arnold, on the 19th of March, 1872; that he, A. G. Burton, with a pencil, first sketched off, as directed by Arnold, the disposition he wished made of his property, "and then wrote off the paper in controversy, which was the same as the sketch except that Arnold directed that some of the younger children should have a horse and some other personal property, which James Woodson had received. This was the only difference between

the paper and the pencil sketch. All the provisions were dic-
tated by Arnold himself, and no suggestions made by any one,
except S. P. Burton asked if he had any sheep, and he said yes,
and directed what should be given to his wife and probably
something was said about a big plow, and he directed a grey
horse to be given to her." He also proves that when they first
went, they had some conversation with Arnold, and then the
witness perhaps remarked to him they had come about the busi-
ness for which he had sent for them; that paper was called for,
but he did not recollect who got it; his wife was in the room,
and she may have gotten it; they were there about four hours,
and the witness thought Arnold's mind was as clear and good as
he had ever known it, and he had known him about fifteen years,
had been a merchant and Arnold had dealt with him; they were
on intimate terms; that at the time of his second marriage he had
some property, but had made the greater part of his property
since that time. He said Woodson Arnold, a nephew of Blake
Arnold, came for him on Sunday to go on the next day to write
the will, and he told him he could not go on that day as he had
to go to Danville to court, but would go on Tuesday. He stated
that neither the wife of Blake Arnold nor any of the propounders
ever spoke to him on the subject of B. Arnold's making a will,
and that he never in his life said a word to the witness about
dividing any of his property among his children; nor did de-
ceased ever state to him that he intended to dispose of his prop-
erty by will, or consult him on the subject. Witness had been
in the habit of writing wills. Arnold was about sixty-eight
years of age. Mrs. Arnold was in and about the room while the
will was being written.

Bottom, one of the subscribing witnesses, proved the execu-
tion of the instrument, and gives about the same history of the
manner of its execution as that given by the draftsman, with the
addition that while Captain Burton was engaged in writing it, he
and S. P. Burton conversed with Arnold about his property,
stock, and notes; he wanted to see if he had enough money or
notes to pay off those to whom he had given money, and they
took down a list of his notes as he gave them out; during the
contest about the will, he, by agreement of the parties, was ap-
pointed curator; that he took an inventory; he found the list

of notes as given by Arnold very accurate; there were some small notes omitted by him, but he found his statement as to other articles of property correct. This witness thought his mind good and that he was fully competent to make a will. He was invited there, or sent for to go to Arnold's on Monday; but afterwards, as Captain Burton could not attend on Monday he was requested to attend on Tuesday.

The testimony of S. P. Burton, the other subscribing witness, was to the same effect as that of Bottom. He stated that he asked Arnold if he had any sheep, and he replied he had; that he had almost forgotten to give his wife some sheep, and then directed six sheep to be given her. He also proves that he said to Arnold that his wife had no use for a big plow without two horses, and that he said yes and directed another horse to be given her. All of these witnesses prove that Arnold took no stimulant while they were with him on that occasion, nor could they discover that he was under the influence of stimulants.

Nichols, then clerk of the Boyle County Court, saw Arnold on the 22d of January, 1869. He was then on his bed, weak and coughing a good deal; he went there with Webb to borrow money, and took a mortgage with him on real estate to secure the debt, if he got the money. When he first applied for the money, Arnold told him he could not get it, but he staid till after dinner, applied again, and Arnold then agreed to loan him the money. Arnold counted it and handed it to him to count, saying there were $1,400. He then counted it and made only $1,380. Webb then counted it and Arnold was right in the amount. He then read to him the mortgage he had prepared, and showed it to Webb, Hannon and Dr. Debo, to see that it was properly acknowledged, and upon their saying it was all right, Arnold told him to record it and send it to Capt. J. A. Burton.

Some four or five other witnesses prove that Arnold, in their opinion, was competent to dispose of his property by will. On the other hand the contestants introduced some twenty odd witnesses, nearly all of whom, having equal opportunities with those introduced by the propounders of the will, of knowing the mental condition of Arnold, who give their opininon that he was not competent, and state facts upon which their opinions were based. His attending physician concurs in this opinion; and it is proved

that the Saturday night before the instrument was written, decedent had a very bad spell; that he was very much enfeebled by disease; he sometimes did not know his neighbors, when they came in, and on one occasion did not know his own daughter.

It is abundantly shown by the evidence that decedent often spoke of the manner he intended to dispose of his property, and so far back as thirty years ago, one witness heard him speak on the subject, others at various times since, bringing his conversation down as late as February, 1872, within a month perhaps of the date of the contested paper; and he was uniform in expressing his determination to make an equal disposition of his property among all his children, often declaring that "the law made the best will." Indeed it may be said that he was almost an enthusiast on the subject, the evidence showing that he took a deep interest in the disposition of property made by some of his neighbors. In speaking to witness, B. Williams, of the will of Crowdus, who, as he had heard, had left some of his children a thousand dollars less than others, this, he said, was unjust, that the law made a better will than any man, and he had heard him express himself in that way several times. To Tadlock he said he understood his father-in-law had cut his wife out, and said it was not right; and in a subsequent conversation Arnold told him he had seen his father-in-law, and that he would now do right, and divide equally; and again in conversation with him, Arnold said to Tadlock he and Tadlock's father-in-law thought alike on the subject and would divide equally. Wm. Gray proved that about six months before Arnold was taken sick he met him in the road; and the former said to him he understood that Mr. Crane, his wife's father, had cut her out of everything, and said it was wrong and he would see Mr. Crane about it; he said he intended to divide his money among his children; that there ought to be an equal division.

The evidence is overwhelming that it was the fixed sentiment of Blake Arnold, when in health, formed in the variation of life, strengthened by the reflection of many years and unwaveringly adhered to as long as he was heard to express himself on the subject, that equality should prevail among his children. For this sudden change of purpose, and the great inequality which will exist if the contested paper is established, the evidence should show some sufficient reason. In the document itself no

reason whatever is suggested. There is no evidence that his affection for his older set of children was not as strong as when he was declaring that "the law made the best will" and that his estate should be equally divided among his children; and no witness ever heard him express a desire to make a will until about three days before the contested paper was written. He had great confidence in the son of his first wife, consulted him in all his important business, and always spoke of him in the kindest terms; he had then been confined by a fatal disease for weeks. On Saturday evening he told his nephew, Woodson Arnold, he wanted to make a will and give his wife the things in the house and the bay horse, "Snip," and said nothing about wanting to dispose of any other property by will. He wanted the witness to go for Ray Williams and Wm. Survant. Next morning when the witness was leaving, deceased told him to go for J. A. Burton, S. P. Burton and Bottom. He told the witness that he had told his son, Woodson, on Saturday, to go for Williams and Survant, and he said it was too late. The witness sat up with him on Saturday night till 12 o'clock.

Witness also proves that the remainder of the night his wife sat up with him and he went to sleep; that decedent said Mrs. Arnold did not like the older children; that deceased did not like Spraggin; and he heard him say, if he died his wife would have Spraggin in there and he did not want him to have anything to do with his business; that he wanted to divide his land among his children, but his wife objected. Other witnesses testify to statements made by him of interference by his wife in reference to disposing of his property among his children; and one, especially, testified to his complaint of his wife's interference, and expressed himself that no punishment was too great for a man who married a second wife.

No change of a purpose to divide his estate equally was ever expressed, or in any way manifested, until he was prostrate by disease on his bed of death, feeble and helpless. His attending physician was hopeless of a recovery, and only administered palliatives, and prescribed whisky, morphine and quinine to be used freely, and he was kept under excitement by these stimulants. His physician saw him on the 17th. He proved that deceased had a very bad spell the night before and he thought he was not capable of much mental exertion; that he prescribed

as much whisky as he would take, and the stimulants had a tendency to confuse his mind. Harrapan proves he was present a portion of the time while Burton was writing the document, and he thought Arnold was under the influence of stimulants; he conversed with him and thought he was flighty.

From all the facts we conclude that the paper in question was procured by the solicitations and secret appeals of the wife to her husband, which, in his weak and enfeebled condition, he was unable to resist; and perhaps there is no one fact in the whole record that tends to strengthen that conclusion more than the verification of his prediction that his wife would have Spraggin in to manage his estate after his death, a man for whom he had repeatedly expressed his aversion, and yet he is the nominated executor.

Judgment affirmed.

*Durham, Jacob, for appellants.*

*Van Winkle, Rodes, P. B. Thompson, for appellees.*